JEREMY R. MORRIS, Esq.
Attorney at Law
PO Box 1296
Hayden, Idaho 83835
Tel. (208) 964-5878
jrmorris81@icloud.com
Idaho Bar No. 8500

Attorney for Plaintiffs.

## U.S. DISTRICT COURT FOR THE

## DISTRICT OF IDAHO

| | |
|---|---|
| MR. JEREMY MORRIS<br>MRS. KRISTY MORRIS,<br><br>       Plaintiffs,<br><br>v.<br><br>WEST HAYDEN ESTATES FIRST<br>ADDITION HOMEOWNERS<br>ASSOCIATION, INC., an Idaho<br>Corporation.<br><br>       Defendant. | Civil No. 2:17-CV-00018-REB<br><br><br>**PLAINTIFFS' MEMORANDUM<br>IN SUPPORT OF MOTION TO<br>DISMISS THE DEFENDANT'S<br>COUNTERCLAIMS** |

Plaintiffs Jeremy and Kristy Morris ("the Morrises" or "Plaintiffs") respectfully submit this Memorandum of Law in support of their Motion to Dismiss all Counterclaims by Defendant West Hayden Estates First Addition Homeowners Association, Inc. (the "Association") for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

Defendant West Hayden Estates Homeowners Association ("the Association") filed a Counterclaim seeking injunctive relief on September 13, 2017 on the basis that Plaintiffs Jeremy and Kristy Morris violated provisions of the Association's CC&Rs and therefore breached their contractual obligations. The Defendant's claims fail to allege sufficient facts to demonstrate a

breach of the Declaration.  Many of the asserted supposed facts are so lacking in bearing a

relationship with the truth that even a minimal inquiry would show many of the Defendant's

assertions to be in error.


## BACKGROUND

Jeremy and Kristy Morris are married.  On December 31, 2014, after having reviewed

the CCRs, *(Exh. 1 Complaint),* and having determined there was no prohibition against their

planned Christmas program, Mr. and Mrs. Morris entered into a contract with the sellers of the

Ferndale Dr. Home:  Kris and Larry Brazeal (hereinafter, "SELLERS"), for the purchase of

13111 N. Ferndale Dr., Hayden, Idaho 83835 for $315,000.  On or about January 3, 2015, and

approximately 3 months prior to closing, Mr. Morris contacted the HOA President, Jennifer

Scott, so as to inform her that he had entered into a contract for the purchase of a home in the

West Hayden Estates HOA and that he would be hosting an annual event from 6-8pm for 5 days.

Mr. Morris offered suggestions to minimize any potential disruptions to the neighborhood that

may result from future Christmas programs, including, but not limited to: utilizing buses to avoid

any traffic congestion.  Mr. Morris also pointed out that there were no rules in the HOA CCRs

that prevented him from hosting this program, but that he wanted to be cordial and encourage

members of the HOA to take part in the festivities if they so desired.  Mrs. Scott suggested Mr.

Morris present the plan to the HOA Board and she scheduled a meeting for that purpose.  Mr.

Morris was advised that he would be called into the meeting, by phone, when they were ready to

speak with him.  The Board held this meeting several days later, but refused to call Mr. Morris

into the meeting.  When Mr. Morris inquired as to why the Board did not call him during the

meeting, the President stated that the Board was furious and would not meet or speak with him.

Mr. Morris informed Mrs. Scott that he would be proceeding with the purchase of the home as there was no rule against hosting a Christmas fundraiser, putting up Christmas lights, or any other relevant prohibition within the Covenants and Restrictions according to numerous attorneys that Mr. Morris had consulted.

On January 16, 2015, Mr. Morris received a certified letter from the HOA referencing "litigation." *Exh. 2 Complaint*. The letter stated, in part, "And finally, I am somewhat hesitant in bringing up the fact that some of our residents are non-Christians or of another faith and I don't even want to think of the problems that could bring up." The letter also mentioned a fear that the Morris Family Christmas show would bring "undesirables" to the neighborhood. Mr. Morris contacted the HOA President and expressed his concerns about the certified letter. Mrs. Scott admitted during this conversation that the HOA had indeed engaged in discrimination against the Morris family. Kristy Morris was also concerned and became distressed and was advised by her Pastor, Paul Van Noy to not move to the home. *Exh. 17, Complaint.* In another phone conversation, President Scott explained that when drafting the certified letter, it was originally written so as to greater emphasize religious objections to the Christmas program. She stated, "it was even worse before the letter was toned down." On or about February 1, 2015, Mrs. Morris was informed by SELLER Kris Brazeal that the HOA had drafted a letter about the Morris family and the Christmas program and was walking that letter around the neighborhood. Mrs. Brazeal stated that she believed she was required to share the existence of this new letter because the SELLERS did not want anything to "hinder the sale of our house." She stated that the letter being distributed to all of the neighbors "did not paint the Morrises and/or Christmas show in the best light." Mrs. Brazeal also relayed conversations she had with other neighbors

including a realtor who shared Kris Brazeal's belief that the Morris family was being "discouraged from buying a house in the neighborhood."

Mr. Morris refused to be intimidated.  The Morrises closed on their home in March 2017. Harassment and death threats against the Morris family ensued over the subsequent two years. The Plaintiffs held their Christmas program in December 2015 and 2016, but encountered harassment and interference.  The Plaintiffs filed this federal lawsuit on January 13, 2017 on the basis that the Defendant violated §3604(b), §3604(c), and §3617 of the Fair Housing Act.  The Plaintiffs are seeking monetary damages and injunctive relief on the basis of these claims.

On February 9, 2017, the Defendant filed a Motion to Dismiss for 1) failure to exhaust administrative remedies of the Idaho Human Rights Act, and for 2) Plaintiffs' Fair Housing Claims and the failure to state a claim under FRCP §12(b)(6).  On August 24, 2017, the Court granted the Defendant's Motion to Dismiss on the Idaho Human Rights Act claim, but denied the Defendant's Motion for the FHA claims.  On September 13, 2017, the Defendant filed an Answer to Plaintiffs' Complaint along with a Counterclaim seeking injunctive relief and attorney's fees pertaining to the Counterclaim, alleging that Plaintiffs breached provisions of the Homeowners Agreement, (hereinafter, "Declaration" or "CCRs").  Plaintiffs now seek to have Defendant's Counterclaim dismissed for failure to state a claim.

## ARGUMENT

## I.  The Court Should Dismiss the Defendant's Counterclaims for Failure to State a Claim Upon Which Relief Can be Granted

### A.     Governing Legal Standard

Federal Rule of Civil Procedure Rule 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). Federal Rule of Civil Procedure 8(a) provides that "[a] pleading tht states a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Dismissal under Rule 12(b)(6) by a court is "appropriate where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *See Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1990).

To survive a Motion to Dismiss filed under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' "Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 Led.2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Id.*

However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. *Id.* Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* In order to survive a motion to dismiss, "the non-conclusory factual content, and reasonable inferences from that content must be plausibly suggestive of a claim entitling the Plaintiff to relief." *Moss v. U.S. Secret Serv.,* 572 F.3d 962, 969 (9th Cir. 1987).

**B.     Counterclaim for Injunctive Relief for Breach of Declaration**

Defendant's Counterclaim for the alleged breach of CCRs by Plaintiffs rests largely on two premises:  1) Plaintiffs' home is unkempt: a visual nuisance in that Christmas lights and other Christmas materials are kept up "throughout the year." *Counterclaim, par. 2, 11*. That

during operation of Plaintiffs' two-hour, 5-day Christmas fundraiser the program is an inconvenience to neighbors and offensive to the senses.  The argument proffered by the Association relies wholly upon breach of contract theory and underlying principles of nuisance. To accept the Association's aforementioned assertions as truth, is to accept a tortured interpretation of the plain meaning of the CCRs in an effort to fit presuppositions put forward by the Defendant.  In plain English, what some might call "a bit of a stretch."  By filing a counterclaim based upon obviously false information, the Defendant has either willfully disregarded incontrovertible facts or otherwise ignorantly made these assertions without the due diligence of a reasonable inquiry as required by F.R.C.P. Rule 11.

        The Plaintiffs contend that in addition to per se discriminatory statements and actions taken by the Defendant since January 2015 that seemingly non-religiously motivated actions are merely a pretext for discriminatory conduct.  The Plaintiffs worry that Defendant's Counterclaim represents yet another pretext because the entire counterclaim relies on information that, if not willfully ignorant, looks and smells like yet another pretext for Defendant's pattern of discriminatory conduct.  Specifically, Defendant's Counterclaim *repeatedly* references Christmas items left out "throughout the year."  Yet even a bare-bones minimal inquiry—literally just standing in front of the Morris property—would reveal that the only Christmas item not packed up and sent for storage and remaining on the property "throughout the year" is a wooden Christian cross.  (See Exhibit  ).  If this single item is the item Defendant has in mind when repeatedly referencing Christmas items left out "throughout the year," then the Defendant should have dispensed with vague generalities.  The Defendant should have stated that the only item remaining throughout the year, a Christian Cross, should be removed.

**1. Defendant's cannot prove that Plaintiffs are in violation "throughout the year, as elements of the fundraiser, are left in place on the property"** *Counterclaim, par. 11,* **because the assertion is either intentionally false or otherwise so negligently investigated as to be a reckless disregard for the truth.**

In order to survive a Motion to Dismiss, the Defendant must demonstrate facial plausibility. "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Twombly*, 550 U.S. at 570. The Defendant's assertion that the Plaintiffs are in violation "throughout the year" is false. The only item left up throughout the year is a Christian cross. The Defendant's vague references to what these items are only get clarification on one page of the counterclaim: "include[ing] strings of holiday lights stapled to the siding and roof of the Plaintiffs' home." *Counterclaim, par. 11.* First, there have never been staples to the siding of Plaintiffs home because the home utilizes HardiePlank siding which is made of concrete. Staples cannot go into concrete. Plaintiffs Christmas lights are actually attached by a custom-made wooden groove system. No staples are used and removal of all lights from the structure of the home can occur in less than three hours. *Exhibit 18.* Defendant's Counterclaim also references "throughout the year" in Paragraph 23. "The Property is maintained in an unsightly and unattractive condition due to the Plaintiffs failure to remove the holiday lights from their home throughout the year, and their failure to remove and properly store other articles and equipment associated with the Christmas fundraising program." *Counterclaim, par. 23.* There is no other way to address these claims other than to say they are knowingly false or lacking in any reasonable inquiry. Plaintiffs' lights are removed at the first melting of snow. In 2017, that removal occurred on the same day as the Morris family's neighbors who recently bought the

neighboring residence. To the extent that the Association may view lights buried beneath 3 feet of snow a nuisance, the Plaintiffs would inquire both as to the feasibility of their earlier removal as well as the nuisance posed by lights and other decorations not visible without a snowplow. *Exhibit 19, 20.*

 **2. Defendant's claim that Plaintiffs violate Article V. §5.1.3 by changing the home from a single-family residential purpose to a non-residential use by conducting a 10 hour per-year private fundraiser betrays interpretation of commercial vs. residential use.** *Counterclaim, par. 15-16.*

 Defendant claims that the two-hour fundraiser for children's cancer hosted by the Morris family from 6-8pm for five days per year constitutes a non-residential purpose. If the Court were to agree, the Court would be standing for the proposition that any fundraiser or backyard BBQ could become subject to scrutiny for non-residential uses. But fundraisers, yard sales, and even huge backyard weddings have always been considered residential uses. Put another way, this Christmas fundraiser for children occurs for 10 hours a year. There are 8,760 hours in a year meaning that the prohibition sought by the Defendant is for a fundraising activity confined to the Morris property for exactly 1/876 of the year.

 No case law exists to support the proposition that a fundraiser at a private residence is a non-residential use. But if such case law did exist, the question would turn on the issue of reasonableness. A two-hour, private fundraising program from 6-8pm which cannot be seen from any other property (no driveways or other frontages face the Morris property) is not unreasonable nor does it render the Morris home a commercial enterprise. *Exhibit 21.* When Mr. Morris spoke with the Sheriff in 2015 about a request for security because Mr. Morris had received a death threat from a neighbor, the Sheriff, who was familiar with the Christmas

program from news reports, stopped Mr. Morris far into the conversation and said, "Wait, wait, wait. You've been talking for awhile, but did I just come to understand that this event is not going on at 11 or 12 after midnight? It's only 6-8pm? I don't understand what the problem is."

The Defendant's Counterclaim continues the non-residential use argument by pointing out that buses are used to transport Christmas program patrons. *Counterclaim par. 16.* But the Defendant knows that the purpose of the buses was to remove any argument by the Association that traffic was an issue. There is no traffic. *Exhibit 22.* The Plaintiffs' religious program causes less traffic than other events hosted by other property owners because the Morrises transport patrons by bus and employ traffic controllers to avoid even the appearance traffic issues. The use of buses to transport people from a nearby city-owned park directly to the foot of the Morris family's driveway was done to accommodate any concerns for traffic. Although some HOAs own the actual streets within a subdivision, the West Hayden Estates subdivision follows the vast majority of developments in that the county owns the streets in the West Hayden Estates subdivision. The HOA and/or its members/agents engaged in a harassment campaign by repeatedly contacting the Kootenai County Sheriff's Department during the Christmas program over the issue of a handful of cars belonging to either volunteers or handicapped persons that were parked in the neighborhood. *Exhibit 23.* The deputies repeatedly reminded HOA members that the streets are public streets and there is no prohibition on parking vehicles or otherwise using the streets in a legal manner. The buses used in the Christmas program have eliminated nearly all traffic that would otherwise come to view the display. Although such traffic is beyond the purview of the CCRs, the Morrises have nonetheless sought to be neighborly by utilizing buses. If the Plaintiffs did not use buses, there can be little doubt that the HOA would not be complaining about the use of buses as a sign of non-residential activity, but rather, that the lack

of a shuttle service caused great disruption.  Unfortunately for the Defendant, the use of buses largely disarms nearly every legitimate concern that would otherwise be made by the Defendant and exposes the assertion of non-existent traffic on public roads for what it is:  a camouflage smokescreen; a pretext for religious discrimination.

During the hours of 6-8pm, it would be difficult for an outsider without knowledge to even discern that an event was going on (unless standing in front of the actual home), other than the cars belonging to some volunteers parked legally in the subdivision.  Buses delivering fundraiser attendees from a nearby park to the edge of the Morris family driveway does not make a property commercial.

**3. Defendant's claim that Article V. §5.4.2 of the Declaration, "Nuisances" is applicable to the Morris family's Christmas program is contrary to the common law and to the plain meaning of the CCRs. *Counterclaim par. 17-19.***

According to Article V. §5.4.2 of the Declaration, "No noise or other nuisance shall be permitted to exist or operate upon any portion of the Property so as to be offensive or detrimental to the Property or to its occupants or to other property in the vicinity or to its occupants."  The Defendant's Counterclaim notes that the Declaration further states, "no exterior speakers, horns, whistles, bells or other sound devices, flashing lights or search lights...".  The Counterclaim notes that the "holiday fundraising program includes noise such as caroling, concerts, and other musical events, causes a significant increase in traffic in the subdivision, incorporates excessive lighting and visual interference, and is, in itself, a nuisance condition by virtue of its operation..."

Every claim made by the Defendant in the preceding paragraph is either lacking in common sense, plainly false or otherwise misleading or vague.  The Defendant argues that caroling constitutes a nuisance.  But the proposition that caroling is a nuisance is likely to be

seen by a jury as an unreasonable contention that few would agree with. The carols last for

minutes out of the two hours the lights are even on, they are not amplified in any way, and they

consist of members of the community singing by candlelight as shuttles of disabled persons from

nearby nursing homes bring the sick and the dying to watch the community gathered together to

sing Christmas songs and Christian hymns to candlelight. *Exhibit 24.* The only thing that is

offensive is the Defendant's claim that this is "offensive or detrimental."

The defendant cites a prohibition against "horns, whistles, and bells." While it is true

there is a single, small bell that is only rung when a huge donation is made during the two-hour

event, this could hardly be what Article V. §5.4.2 envisioned. And if it is what this provision

intended, the Court should strike this provision on account of vagueness and impractical

application. For example, numerous children ride their bikes in the neighborhood traveling up

and down driveways with the chime of an attached bell to the handlebars. Every vehicle parked

in driveways in the neighborhood have car horns which are significantly louder than any noise a

handheld bell could ever make during a large donation. Moreover, none of this sound can be

heard by neighbors as the sound is of such a low decibel that even in the open air, the sound can

barely be heard when standing in front of the Morris residence. Only backyards face the Morris

home from across the street and the two lots adjacent to the Morris residence include massive

attached garages that separate the living quarters of the neighbors from the walls closest to the

Morris home. *Exhibit 21.* In sum, unless actually attending the event, people would be hard

pressed to even know an event was going on, let alone consider it a nuisance.

**4. Defendant's claim that the Plaintiffs breached Article V. §5.4.3 re: sign**

**restrictions is flawed because the CCRs could never have imagined this provision applying**

to a sign for a fundraiser or a sign that is part of a holiday decoration. *Counterclaim par. 20-21.*

Article V. §5.4.3 states, "No sign of any kind shall be displayed to the public view without prior written Committee approval." Defendant's Counterclaim neglects to explain what signs the Morrises have on their property during the Christmas program. The only two "signs" are one that says, "Merry Christmas" (made from C9 Christmas Light bulbs), and another sign that says, "Free Hot Chocolate and Cotton Candy" (made from mini-white Christmas lights) along with a date and time of the fundraiser also in lights at the bottom. These two "signs" should be viewed in the way they were intended: decorations. One homeowner has a sign up for Halloween that says, "Boo." Is this a violation? Other homeowners have seasonal garden flags attached to rods. One says, "Fall" with pictures of pumpkins. A common understanding of §5.4.3 should interpret "signs" to mean such things as billboards for home businesses or other commercial activity. Furthermore, even under this more narrow definition of commercial activity, a member might run afoul of the expansive interpretations of this provision. Numerous HOA members have massive company trucks parked in driveways with large block letters with such phrases as, "RDI Heating and Cooling" and another featuring an add for a plumbing business. The likelihood is that §5.4.3 was probably intended for wooden or plastic yard signs advertising commercial activity, not decorative, temporary holiday pieces that wish the reader a "Merry Christmas."

**5. Defendant's claim that the Plaintiffs breached Article V. §5.4.7 re: Exterior Maintenance and Owner Obligations should be dismissed because Defendant provided false information.** *Counterclaim, par. 22-23.*

The Defendant states, "the Property is maintained in an unsightly and unattractive condition due to the Plaintiffs/Counter-Defendants' failure to remove the holiday lights from their home throughout the year, and their failure to remove and properly store other articles and equipment associated with the Christmas fundraising program." *Counterclaim, par. 23.* The Defendant is well aware that within several days of the many feet of snow melting, the Plaintiffs remove the lights, sleigh, Santa platform, hay for the Nativity, and all other Christmas decorations from the property. *Exhibit 19.* They are stored at Advanced Storage in Coeur d'Alene. *Ibid.* Unlike other false claims of the Defendant that can arguably be said to be beyond the knowledge of the Defendant's attorneys, Rule 11 makes it clear that at least a reasonable inquiry must be made in order for an attorney to properly sign pleadings, which would include the Answer-Counterclaim filed by the Defendant on September 13, 2017.  (FRCP, Rule 11). There can be no greater example of a more easily achievable "reasonable inquiry" than to simply stand in front of the Plaintiffs home to see that the only Christmas" item the Morrises leave out "throughout the year" is a wooden Christian cross. *Exhibit 25.* If the Defendant wishes to amend their Counterclaim to take issue with the Morrises having a Christian cross on their property "throughout the year" then the Morrises would not object to such wording.  However, the Plaintiffs suspect that such wording would be counterproductive to the Defendant.

**6. Defendant's claim that the Plaintiffs breached Article V. §5.4.11 re: Unsightly Articles is false should be dismissed because Defendant provided false information.** *Counterclaim, par. 26-27.*

During the Christmas program, items incorporated into the program such as heaters, decorative torches, tables, chairs, etc, are removed each night immediately following the program by approximately 20 volunteers.  They do not remain out during the 5 nights of the 2-

hour program.  The Defendant states, "Plaintiffs store and operate various forms of equipment on

their lot for their Christmas fundraising program over the course of multiple days without being

in an enclosed structure or screened from view."  The Defendant claims this would violate

§5.4.11 because "no equipment, heat pumps, compressors, containers, lumber, firewood, grass,

shrub or tree clippings, plant waste, bulk metal, refuse or trash" are to be "stored or allowed to

accumulate."  Even if one were to classify heaters, tables, and other items that are not included in

the list as prohibited "unsightly articles," these items are all stored not only throughout the year,

but even throughout the 5-day period during which the event takes place, except literally when

being used.  A crew of volunteers brings these items out each time they are used for those 2

hours.  If the Defendant suggests that a storage provision should apply even "during use," then

items such as compressors and tree clippings would prohibited entirely.  To define "storage and

accumulate" so broadly as to include "during use," would be both unenforceable and impractical.

Under such a scenario, tree clippings would violate this provision as soon as they hit the ground.

A compressor would effectively be banned entirely because the moment it was wheeled outside

of a garage to prevent carbon monoxide poisoning, the Association could claim this was an

unsightly article.  During the 5-day program, heaters, tables, and other equipment (other than

Christmas lights and decorations) are stored within the Morris home until 6pm when volunteers

place these items on the Morris family driveway.  At 9pm they are removed.  Tables and heaters

are thus exposed to the outdoors for approximately 10 hours annually in total.  The HOA

recently hosted a party at a home neighboring the Morris family.  They placed tents, tables, and

grills in a driveway which remained out all day long.  Similiarly, the HOA has held other events

including a neighborhood block party.  The HOA not only blocked off an entire street, but also

incorporated numerous pieces of equipment on multiple properties and on actual public roads.

7. **Defendant's claim that Plaintiffs breached Article V. §5.4.9 by introducing a "unsafe or hazardous" conditions such as a camel/sheep, increases in traffic, and a limit to emergency access should be dismissed or withdrawn by Defendant prior to a potential Rule 11 Sanction.** *Counterclaim, par. 24-25.*

  a. **Pedestrians / Vehicular Traffic.**  The Association is aware that there is almost  zero traffic in the subdivision during the Christmas program as the attendees arrive by bus. *Exhibit 22.* At any given time there might be 2 or at maximum, three buses making their way through the subdivision from the hours of 6-8pm.  This is no more disruptive than a garbage truck passing by on trash collection day.  There are very few pedestrians walking down the street. Nearly every pedestrian in the street is an HOA Board member or their proxy attempting to cause trouble, phoning the police constantly, and harassing children with foul language.

  b. **Camel / Sheep.**  The HOA was informed at a meeting in November 2015 that Dolly the Camel is an elderly camel.  She is an ambassador to children and serves children throughout the community.  She has eaten thousands of carrots fed to her by children with no injuries. Dolly the camel and her sheep and donkey friends are owned by a mobile petting zoo and only brought onto the property during the hours of the Christmas show.  They are covered by a separate insurance policy of that owner.  Dolly and her friends are touched by thousands of children annually at the Kootenai County Fair, the Spokane County Fair, the Bonner County Fair, the Journey to Bethlehem in Washington state, Green Bluff pumpkin patch, and even the KXLY studio news. *Exhibit 26.* To suggest these animals are more hazardous than the pit bulls residing permanently within the HOA and often walked through the street is not a reasonable statement.

  c. **Limiting Emergency Access**.  The Association, through Counsel knowingly submitted this false allegation to the Court.  The only blocking of the road has occurred during

block parties hosted by the HOA and informal gatherings such as the illegal firework show

hosted by one HOA member which has drawn other HOA member participants.  To-date, the

HOA has not sued that member in an effort to put an end to his annual illegal fireworks display.

Unlike HOA Block Parties and illegal road-blocking firework shows *Exhibit 27,* the Morris

family has never obstructed traffic.  To the contrary, the Plaintiffs hire paid, professional "traffic

control" during each Christmas program to ensure that at all times, the few drivers that do decide

to drive through the subdivision during the show must keep moving.  No emergency vehicles are

blocked and the roads look eerily quiet.  *Exhibit 22.*

**8. Plaintiffs did not breach Article V. §5.4.15 because this provision does not apply
to temporary Christmas lights.  (Counterclaim, par. 28-29).**

The Defendant quotes Article V. §5.4.15, "Lighting shall be restrained in design, and

excessive brightness shall be avoided."  They claim that Christmas lights create an "extremely

and excessively bright light, at night, during the operation of the program.  The lighting is not

restrained in design."  Claiming that temporary Christmas lights do not comply with a <u>design</u>

requirement of CCRs does not follow the plain meaning of the portion of this section provided

by opposing counsel.  However, the CCRs actually provide more detail to underscore the

outrageous interpretation put forward by the Defendant.  Article V. §5.4.15 states in its entirety,

"Exterior lighting, including flood lighting, shall be part of the architectural concept of the

Improvements on a Lot.  Fixtures, standards, and all exposed accessories shall be harmonious

with building design, and shall be as approved by the Architectural Committee prior to

installation.  Lighting shall be restrained in design, and excessive brightness shall be avoided."  It

should come as no surprise that the Defendant chose to avoid referencing §5.4.15 in its entirety

because the context only further undermines the interpretation put forward by the Association.
The following words are used:

     a.  flood lighting
     b.  architectural concept
     c.  improvements on a lot
     d.  fixtures
     e.  building design
     f.  installation
     g.  restrained in design.

The words above do not apply to temporary Christmas lights.  Installation, fixtures, architectural concept and design, et al. are words that have always applied to permanent lighting.  When asked by Mr. Morris why the HOA was making arguments with such little basis in reality, then HOA President Ron stated, "It never had anything to do with Christmas lights.  It had to do with security lights shining in your window.  Even the President of the Association in 2016 agreed that this does not apply to Christmas lights.

**9.  Plaintiffs did not breach §5.5.2 re: animals because the Plaintiff does not raise, keep, or breed reptiles, livestock, or poultry.** *Counterclaim, par. 30-31.*

According to §5.5.2, No reptiles, livestock, poultry, or birds of any kind shall be raised, bred or kept on any lot or any portion of this property:  except that no more than two (2) usual and ordinary household pets such as dogs, cats, or birds may be kept, provided that they are not kept, bred, or maintained for commercial purposes and that they are caged or leashed and attended when not on the lot or property where they belong."  The Morris family only owns a single Golden Retriever and a single pet rabbit in a cage.  Therefore, the Plaintiffs do not exceed the two-pet limit, unlike others in the HOA who continue to own more than two pets in contradiction to the rules. *Exhibit 28.*  To the Morris' knowledge, the Defendant has never sued another HOA member for violating §5.5.2., nor have they hired a lawyer for this purpose.  While

other neighbors continue to violate this provision, the Morrises have complied at all times with the 2-ordinary household pet provision.  The Plaintiffs have never raised, kept, or bred the camel, donkey or sheep that the Defendant takes issue with.  The Court will recognize that the terms, "raise, keep or breed" are standard animal husbandry terms used to describe the commercial use of livestock.

The only interpretation through which the Morrises would be found to be violation is if the Court interpreted "kept" to mean, 1) a non-owner, and 2), for any amount of time.  This would prove problematic for a number of reasons.  First, when the Morrises celebrated their daughter's 4th birthday, a pony handler brought a pony painted like "Rainbow Dash" to provide pony rides for children for about 30 minutes in the Morris' backyard. *Exhibit 29*.  Based upon the definition put forward by the Defendant, this too would be a violation even though the pony giving rides for a birthday party was neither the property of the Morris family, nor on the property for any long duration of time.  Second, if the definition meant "any amount of time" then presumably this would include the ordinary household pet two-animal limit.  If a homeowner were to have 2 pets and a neighbor walked their dog to a neighbor's house for a brief chat, then under this scenario, the homeowner would be in violation.  Under any reasonable interpretation, a brief, temporary visitation by a non-owner with a pet not being bred, raised, or kept on the property is not what the drafter of §5.5.2 had in mind.

**10. The Defendant's citation of Article V, §5.1.3 either does not apply to the Plaintiffs, or it should be waived as the Defendant has never required any member to comply with this provision, or otherwise, the Court should strike this provision down as unenforceable because it is overly vague. *Counterclaim par. 13.***

**a. §5.1.3 does not apply because Morris home cannot be seen by neighboring lots.**

According to the Defendant, the Plaintiffs are in violation of the CCRs because every single homeowner must get the prior consent of the Association before decorating their home. This provision actually says, "any lot visible from a neighboring lot." However, the Morrises are uniquely positioned as the first home constructed in the subdivision at the corner of the development. No home faces the Plaintiff's home. *Exhibit 21.* To the east, (across the street) and curving around sharply are the fences of neighbor's backyards. To the north and the south, the adjacent property owners have massive garages that have been constructed along with trees and fencing totally shielding the Morris home from the adjacent neighbor to the south and mostly shielding the property to the north.

**b. If §5.1.3 did apply to the Plaintiffs, the Defendant has never enforced it and has therefore selectively enforced this provision for pre-textual reasons.**

Numerous HOA members decorate their homes with Halloween decorations including, but not limited to: signs, ghosts, coffins, etc. *Exhibit 30.* While the Plaintiff's lot is not visible to neighboring lots as required by this section, other members of the community that do decorate their homes and who <u>are</u> visible to neighboring lots have not received permission and yet have not been subject to enforcement actions. It would be inequitable for the Court to enforce such a provision, even if it did apply, which it does not. The HOA has long ago waived their right to selectively enforce this provision now.

**c. Even if §5.1.3 did apply and even if the Court did not apply the doctrine of waiver, such a provision as stated in the Declaration is overly vague, unenforceable, and therefore, should be struck by the Court from the Declaration.**

Although this section does not apply to the Plaintiff and although it has never been enforced against other members, even if it did apply and had been utilized against other

members, the provision itself is unenforceable because it is overly vague and impossible to effectively and practically enforce equitably.  Does a decoration need to be related to a holiday and if so, do religious symbols on religious holidays also need permission?  If a decoration is not related to a holiday, would a garden flag or "welcome" sign with fall colors constitute decorations in need of obtaining permission?  *Exhibit 31.*  §5.1.3 is vague and should be struck from the Declaration.

**11.  Defendant correctly notes that they have the authority and duty to enforce the provisions of the Declaration, but the Plaintiffs have not violated any provision of the Declaration and Defendant's attempt to "enforce" in their countersuit is not actually to enforce, but for the purpose of providing a much needed pretext.  *Counterclaim, par. 32-33.***

The Plaintiffs have not violated any provision of the CCRs.  The Defendants point to a sign ban, but the sign ban clearly doesn't apply to a Christmas sign.  The Defendant points to traffic, but there is no traffic and the Defendant doesn't own the road in this case.  Here, Kootenai County owns the road.  The Defendant claims the Christmas lights turned on for two hours for 5 days between the hours of 6-8pm constitutes a nuisance and excessive brightness, but the CCRs make it clear that the only lighting provision applies to "design" and "architectural" lighting that is "install[ed]."  The Defendant claims a camel is hazardous, but that camel has been fed carrots by tens of thousands of children at events in Idaho and two neighboring states for the past 20 years.  Meanwhile, the Defendant is aware that some of its members participate in blocking off the street to light illegal fireworks—an activity that most would consider a bit more problematic with the excessive noise and safety concerns not to mention that it is illegal.  *Exhibit 27.*  The Defendant cites a provision banning animals, but that provision applies solely to animal husbandry and not to an animal belonging to another owner that is standing temporarily on grass

much in the same way a child's birthday pony ride would similarly fall under this provision if we were to accept the Defendant's interpretation. The Defendant claims that the Plaintiffs home is being used in a manner that is inconsistent with single-family dwelling, but a 2 hour fundraiser could not possibly change the definition of a home into a commercial use, and if it did, it would spell a slippery slope for those involved in charity work, backyard political fundraisers, and even boy/girl scout events that take place throughout the country.

While the Plaintiffs have not violated any of the heretofore mentioned provisions, the HOA has effectively engaged in a game of pretext camouflage to cover for their own illegal discriminatory practices. What makes this even more obvious, is that if the HOA actually believed the enormously fanciful interpretations of the CCRs cited in their Counterclaim, then they certainly would be "on the case" looking for other violators. Sadly, on any sunny afternoon, neighbors happily parade their animals throughout the neighborhood. Not two-by two as the limit for an ordinary pet is "two." But three or even four animals belonging to the same property owner in direct contradiction to the rules. The Defendant claims that permission is required to have decorations, but how many homes throughout the neighborhood received permission for their Halloween decorations in 2016? Interviews with neighbors have produced no such example. Inequitable application of the rules—rules the Plaintiffs never even violated—point in one direction: pretext.

## CONCLUSION

Defendant's claims for Injunctive Relief for Breach of the Declaration must be dismissed for failure to state a claim upon which relief can be based. The Defendant did not adequately allege facts to show that the Plaintiffs violated any obligation required by the CCRs. The arguments made by the Defendant are so beyond any reasonable interpretation of the CCRs that

the fallacious claims made by the Defendant actually bolster the Plaintiffs argument that Defendant's early references to traffic, animals, etc were merely intended as a smokescreen to provide the necessary pretext to cover for the Defendant's real motives for opposing the Christmas program.  The pre-textual motive for the HOA is evident from their original letter: "And finally, I am hesitant in bringing up the fact that some of our residents are non-Christians or of another faith and I don't even want to think of the problems that could bring up." *Complaint, Exhibit 2.*  The arguments made by the Defendant in their Counterclaim are a continuance of the pre-textual strategy to avoid addressing the religious motivations of the Defendant.  The claims could never overcome the plausibility requirement of *Ashcroft* or the reasonable inference requirement of *Twombly*.  "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Id.*  Here, there is no such reasonable inference. *Twombly*, 550 U.S. at 570.  The Defendant has put forward assertions with no basis in fact and that are readily identifiable as false simply by looking upon the Morris home.  For the foregoing reasons, the Defendant's Counterclaims against the Plaintiffs should be dismissed in their entirety.

Dated this ___ day of October, 2017

By: _____
Jeremy R. Morris, Esq. ISB #8500
Attorney for Plaintiffs