# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

JEREMY R. MORRIS, KRISTY
MORRIS,

      Plaintiffs/Counter-Defendants,

      v.

WEST HAYDEN ESTATES FIRST
ADDITION HOMEOWNERS
ASSOCIATION, INC.,

      Defendant/Counter-Claimant.

Case No. 2:17-cv-00018-BLW

MEMORANDUM DECISION AND
ORDER

## INTRODUCTION

Three motions are presently before the Court: Jeremy Morris' and Kristy Morris'

Motion for Injunctive Relief in the Form of De-Annexation from the West Hayden

Estates Homeowners Association (Dkt. 107); West Hayden Estates First Addition

Homeowners Association, Inc.'s (hereinafter, "Homeowners Association") Motion for

Judgment as a Matter of Law Pursuant to Federal Rule of Civil Procedure 50(b); and the

Homeowners Association's Motion to Strike Affidavits of Jeremy Morris, Lorilee Anne

Addy, and Russell Deming (Dkt. 115). The Court GRANTS the Homeowners

Association's Motion for Judgment as a Matter of Law. Plaintiffs' Motion for Injunctive

Relief in the Form of De-Annexation from the West Hayden Estates Homeowners

Association (Dkt. 107) and the Homeowners Association's Motion to Strike Affidavits of Jeremy Morris, Lorilee Anne Addy, and Russell Deming[1] (Dkt. 115) are DENIED.

## LEGAL STANDARD

### 1. Judgment as a Matter of Law

Federal Rule of Civil Procedure 50 governs a request for a judgment as a matter of law. Under Rule 50(a), a party must first move for judgment as a matter of law before the case is submitted to the jury and "specify . . . the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). Under Rule 50(b), if the court denies the pre-verdict motion, "the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b). The failure to make a Rule 50(a) motion before the case is submitted to the jury forecloses the possibility of the Court later considering a Rule 50(b) motion.[2] *Tortu v. Las Vegas Metropolitan Police Dep't.*, 556 F.3d 1075, 1083 (9th Cir. 2009). Furthermore, "[a] post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion." Fed. R. Civ. P. 50(b), advisory committee's note to 1991 amendment.

---

[1] The Court has reviewed the affidavits put forth by Plaintiffs. Because the affidavits do not alter the result in this case, the Court will consider them in its decision without expressing any opinion as to whether they were properly submitted.

[2] The Homeowners Association made the required Rule 50(a) motion at trial and is therefore entitled to renew its motion under Rule 50(b).

A court may grant a Rule 50 motion for judgment as a matter of law only if "there is no legally sufficient basis for a reasonable jury to find for that party on that issue." *Krechman v. County of Riverside*, 723 F.3d 1104, 1109 (9th Cir. 2013) (citing *Jorgensen v. Cassiday*, 320 F.3d 906, 917 (9th Cir. 2003) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000))). "A jury's verdict must be upheld if it is supported by substantial evidence . . . even if it is also possible to draw a contrary conclusion from the same evidence." *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007). "[I]n entertaining a motion for judgment as a matter of law, the court . . . may not make credibility determinations or weigh the evidence." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (quoting *Reeves*, 530 U.S. at 150). Rather, "[t]he evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party." *Id.*

## 2. New Trial Pursuant to Rule 59(d)

Rule 59(d) provides that "[n]o later than 28 days after the entry of judgment, the court, on its own, may order a new trial for any reason that would justify granting one on a party's motion."[3] A trial court has not only the right but "indeed the duty . . . to weigh the evidence as he [or she] saw it . . . and to set aside the verdict of the jury, even though supported by substantial evidence, where, in his [or her] conscientious opinion, the

---

[3] No judgment has been entered in this case, despite the jury's verdict having been entered on November 20, 2018. Dkt. 103. The Court reserved for itself the determination of the Homeowners Association's counterclaim. Neither party objected. Accordingly, the Court is entitled, under the timeframe set forth under Rule 59(d), to order a new trial.

verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial judge, a miscarriage of justice." *Moist Cold Refrigerator Co. v. Lou Johnson Co.*, 249 F.2d 246, 256 (9th Cir. 1957).

"Although a court need not consider the evidence in a manner that favors the prevailing party and it may grant a new trial even if there is some evidence in support of the prior decision, it should not grant a new trial unless it more than simply disagree[s] with the verdict." *Gates v. Boyle*, No. CV 05-59-M-DWM, 2007 WL 9710298, at *1 (D. Mont. Mar. 15, 2007) (Molloy, J.) (internal quotation omitted). "[A] decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter." *Landes Const. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987) (citation omitted). "Nonetheless, a new trial is appropriate where the court has a firm conviction of the jury's error and an attendant miscarriage of justice." *Gates*, 2007 WL 9710298, at *1 (internal quotations omitted). Unlike a Rule 50 motion, under Rule 59 the trial court may assess the credibility of the witnesses. *See Kode v. Carlson*, 596 F.3d 608, 612 (9th Cir. 2010) (per curiam). A new trial may also be granted if the Court concludes that a party was prejudiced by erroneous evidentiary decisions or by some other unfairness in the trial. *See Gilbrook v. City of Westminster*, 177 F.3d 839, 858 (9th Cir. 1999).

### 3. Remittitur

Rule 59 also allows the trial court to "grant a defendant's motion for a new trial or conditionally deny the motion, provided the plaintiff accepts a remittitur." *J.N. v. Hendrickson*, No. 214CV02428DDPPLAX, 2017 WL 2539390, at *3 (C.D. Cal. June 12, 2017) (citing *Fenner v. Dependable Trucking Co.*, Inc., 716 F.2d 598, 603 (9th Cir. 1983). The reduced award "must reflect the maximum amount sustainable by the proof." *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1094 (9th Cir. 2014) (internal quotation and citation omitted). "The plaintiff may choose either to accept the reduced damage award or to submit to a new trial." *Hendrickson*, 2017 WL 2539390, at *3. Broadly, remittitur is appropriate when the damages are "grossly excessive or monstrous, clearly not supported by the evidence, or only based on speculation or guesswork." *Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1360 (9th Cir. 1986).

### 4. Interpretation of CC&R Provisions

Restrictive covenants are valid and enforceable in Idaho. *Sun Valley Ctr. v. Sun Valley Co.*, 107 Idaho 411, 413 (1984). A number of principles apply when a Court interprets CC&Rs. First, "covenants are not to be construed to extend by implication any restriction not clearly expressed in the covenants." *Brown v. Perkins*, 129 Idaho 189, 192 (1996). Second, "all doubts and ambiguities are to be resolved in favor of the free use of land." *Id.*

Other than the rule that CC&R provisions will not be extended by implication, ordinary rules of construction apply when interpreting CC&R provisions. *Sun Valley*

*Ctr.*, 107 Idaho at 413. Where the terms of the CC&R provisions are clear, interpretation is a question of law. *City of Chubbuck v. City of Pocatello*, 127 Idaho 198, 201 (1995). Conversely, where the terms of the CC&R provisions are ambiguous, interpretation is a question of fact. *St. Clair v. Krueger*, 115 Idaho 702, 704 (1989).

## ANALYSIS

The Court's decision will proceed in the following fashion. First, the Court will offer two prefatory observations regarding the key piece of evidence in this case and an evidentiary issue that unfairly prejudiced the Homeowners Association. Then, the Court will evaluate the specific evidentiary deficiencies for each of Plaintiffs' three Fair Housing Act claims. Finally, the Court will evaluate the Homeowners Association's counterclaim.

1. **An Ordinary Reader Would Not Interpret the Letter Sent by the Homeowners Association to Plaintiffs as Discriminating on the Basis of Plaintiffs' Religion**

   A. *Background*

The Court begins by reviewing the evidence that forms the crux of Plaintiffs' case: the letter sent by Board Member Pat Kellig to Plaintiffs on January 15, 2015 (hereinafter, the "January 2015 Letter"). Exhibit 3005[4]. The first draft of the January 2015 Letter was written by West Hayden resident and former member of the West Hayden Homeowners

---

[4] The Parties stipulated that the January 1, 2014 date at the top of the letter was a scrivener's error. The letter was sent out on January 15, 2015.

Association Board Larry Strayer.  In his draft, which Mr. Strayer shared with the Board

via email on January 14, 2015, Mr. Strayer first identified a number of CC&R provisions

that he believed Plaintiffs' Christmas program would violate.  Exhibit. 1091.  Then, Mr.

Strayer added the following conclusion:

> And finally, I am somewhat hesitant in bring up the fact that some of our
> residents are avowed atheists and I don't even want to think of the
> problems that could bring up. It is not the intention of the Board to
> discourage you from becoming part of our great neighborhood but we do
> not wish to become entwined in any expensive litigation to enforce long
> standing rules and regulations and fill our neighborhood with the riff-raff
> you seemed to attract over by WalMart.. [*sic*] Grouse Meadows indeed!!!
> We don't allow "those kind" in our neighborhood.

Exhibit 1091 at 2.  Mr. Strayer's draft was subsequently reviewed and edited by several

members of the Board, including Board President Jennifer Scott and Ms. Kellig.  Ms.

Kellig circulated a draft on January 15, 2015 in which she "changed the atheist bit and

toned . . . [the draft] down."  Exhibit 1091 at 3.

Even though Ms. Kellig did not have Board approval to send the January 2015

Letter, which was still being edited, Ms. Kellig nevertheless sent it to Plaintiffs.  The

version of the January 2015 Letter sent to Plaintiffs changed Mr. Strayer's language to

the following:

> And finally, I am somewhat hesitant in bringing up the fact that some of
> our residents are non-Christians or of another faith and I don't even want to
> think of the problems that could bring up.  It is not the *intention* of the
> Board to discourage you from becoming part of our great neighborhood but
> we do not wish to become entwined in expensive litigation to enforce long
> standing rules and regulations and fill our neighborhood with the hundreds
> of people and possible undesirables.  We have worked hard to keep our area
> peaceful, quiet, and clean.  Neighbors respect the CC&R's [*sic*] and show

common courtesy to those around them.  These are why people want to live here.

Exhibit 3005.

### B.    *Analysis*

Before turning to the analysis below, the Court acknowledges that at the summary judgment phase of this proceeding, it concluded, largely on the basis of January 2015 Letter, that West Hayden was not entitled to summary judgment.  Specifically, the Court stated that "the letter . . .  coupled . . .  with other statements . . .  [suggesting that members of the West Hayden Board had a] personal animus [towards Plaintiffs]" was sufficient to survive summary judgment.  Dkt. 59, 42:9-16.

In retrospect, the Court believes that its earlier decision was in error.  The Board's revisions to Mr. Strayer's draft demonstrate that it was not the Board's intent to discriminate against Plaintiffs based on their religion.  To the contrary, an ordinary reader would plainly understand the Board's statement that "some of our residents are non-Christians or of another faith and I don't even want to think of the problems that could bring up" (Exhibit 3005) as an attempt to express a concern that Plaintiffs' Christmas program, if allowed to proceed, would leave non-Christian homeowners in the West Hayden Estates with the impression that an exception was being made to the CC&Rs in favor of Christians.  Far from being intolerant, the January 2015 Letter's religious reference was an attempt to respect religious pluralism.  Furthermore, the January 2015 Letter's use of the term "undesirables" is an attempt raise the safety concerns associated with bringing a large number of unknown individuals to a normally quiet and calm area.

Though the language was not drafted with lawyerly precision, an ordinary reader reviewing the January 2015 Letter would not infer, based solely on the writing's contents, that the Board intended to discriminate against Plaintiffs based on their Christian faith.

Beyond the plain text of the January 2015 Letter, the circumstances in which it was sent also demonstrate that the Board did not intend to discriminate against Plaintiffs. To begin with, the initial draft of the January 2015 Letter was written by a former, rather than current, board member, Mr. Strayer. Of course, Mr. Strayer was likely an agent of the Board given that he was acting at the request of Board President Jennifer Scott, but nevertheless it is telling that the most incendiary language in this case was drafted by a non-party to this lawsuit. Furthermore, Mr. Strayer's language was immediately "toned … down" when it was reviewed by an actual member of the Board, Ms. Kellig. As such, the draft language has little if any relevance to the *Board's* actual intent; at most, it reveals Mr. Strayer's feelings about Plaintiffs' Christmas program.

Additionally, any intent by the Board to discriminate is also belied by the fact that Ms. Kellig did not obtain final approval from the Board before she sent the January 2015 Letter to Plaintiffs. Thus, the January 2015 Letter provides, at most, an incomplete picture as to the Board's true intent. Indeed, Ms. Scott testified that had she had the opportunity to review the January 2015 Letter before Ms. Kellig sent it out, she would not have approved of sending it. Although Ms. Scott's testimony may have been partially

a product of hindsight, it is still true that the January 2015 Letter lacked the Board's official approval and did not, in any event, reflect an intent to discriminate.[5]

Finally, the timeframe in which the January 2015 Letter was drafted and sent confirms that the Homeowners Association did not intend to discriminate against Plaintiffs. Plaintiffs entered into a purchase contract for their home on January 5, 2015. Exhibit 3009. Shortly thereafter, on January 12, 2015, Mr. Morris called Ms. Scott to alert her and the Board that he (1) was about to close on a home in West Hayden Estates and (2) intended to use that home for his Christmas program. Mr. Morris informed Ms. Scott that he needed a quick answer regarding whether the Board would oppose his Christmas program on the basis that it violated the CC&Rs. In response, the Board met on January 13th, and the January 2015 Letter was thereafter drafted and sent to Mr. Morris. Exhibit 1091; Exhibit 3005. From this series of events, it is evident that rather than attempting to interfere with Plaintiffs' purchase of the home, the Board was in fact acting in a solicitous manner by trying to get Plaintiffs the quick answer that Mr. Morris was asking for.

**2. West Hayden Was Unfairly Prejudiced by the Admission of Ultimately Stricken Evidence Regarding Threats from West Hayden Homeowners to Plaintiffs and Christmas Program Attendees**

---

[5] That the letter would not have gained the Board's approval and that Board did not intend to discriminate against Plaintiffs because of their Christian faith, is also suggested by the fact that the Board's President, Ms. Scott, was the wife of a Christian Minister.

The trial in this case was also infected by repeated testimony and exhibits related to threats allegedly received by Plaintiffs and other attendees of the Christmas program from homeowners in the West Hayden Estates. For example, Ms. Morris testified that "[w]e had a neighbor that came to our driveway that threatened to kill my husband. And we took the threat seriously. And so it was advised that I just -- I take my daughter and I leave." Ms. Morris identified the individual who threatened to kill her husband as West Hayden homeowner Larry Bird. Additionally, Tatyana Burda, Katie Dotts, Jessica Hotvedt, Annabelle Sky Farley, Blaine Svetich, David Silva, Russell Deming all testified that they witnessed threating behavior from individuals who appeared to be West Hayden homeowners.

The jury also heard Exhibit 3034, in which Mr. Morris surreptitiously recorded a conversation he had with Board Member Ron Taylor. During that exchange, Mr. Morris made the following statement "How about we circulate a letter about Larry Bird threatening to murder my family, by the way it is on tape. It is on tape, played it for the Sheriff's Deputies. It is on tape, says he is gonna take care of me and that the people that showed up, the militia people or whatever the three percenters could not protect me." Exhibit 3034, 4:50-5:06.

After this evidence was offered, but before Plaintiffs' counsel could solicit additional testimony from Mr. Morris on the subject, the Court ordered briefing with respect to whether, under the Fair Housing Act, the Homeowners Association had a duty to police and correct discriminatory behavior from homeowners who were not members

of the Board. After reviewing the briefing and case law, the Court concluded that West

Hayden could not be held liable for conduct by non-party homeowners because it lacked

the ability to police and effectively control the actions of the homeowners that were

allegedly discriminating against Plaintiffs and the Christmas program attendees.[6] The

Court therefore barred Mr. Morris from testifying regarding the alleged death threat made

---

[6] In arriving at this conclusion, I was forced to wade into a difficult area of the law for which there is precious little guidance. The United States Department of Housing and Urban Development ("HUD") has interpreted the Fair Housing Act as creating direct liability for "[f]ailing to take prompt action to correct and end a discriminatory housing practice by a third-party, where the person knew or should have known of the discriminatory conduct and had the power to correct it. The power to take prompt action to correct and end a discriminatory housing practice by a third-party depends upon the extent of the person's control or any other legal responsibility the person may have with respect to the conduct of such third-party." 24 C.F.R. § 100.7. HUD's Rule has not been interpreted within the context presently before me by the United States Court of Appeals for the Ninth Circuit or any district court therein.

At the time of the trial, the closest case to the one before me was *Wetzel v. Glen St. Andrew Living Cmty., LLC*, 901 F.3d 856, 865 (7th Cir. 2018), *cert. dismissed*, No. 18-626, 2019 WL 848273 (U.S. Feb. 22, 2019). In *Wetzel*, Judge Wood concluded that the operator of an elderly community could be held liable under the statutory provisions at issue in this case because the operator failed to deploy its "arsenal of incentives and sanctions" to prevent recurring discrimination by one tenant against the plaintiff on the basis of the plaintiff's sexual orientation. *Wetzel*, 901 F.3d at 865. After the conclusion of the trial in this case, the United States Court of Appeals for the Second Circuit issued its decision in *Francis v. Kings Park Manor, Inc.*, No. 15-1823-CV, 2019 WL 1006554, at *1 (2d Cir. Mar. 4, 2019). In that case, Judge Lohier concluded that a landlord could be held liable for failing "failing to take prompt action to address a racially hostile housing environment created by one tenant targeting another, where the landlord knew of the discriminatory conduct and had the power to correct it." *Id.*

In spite of *Wetzel* and *Francis*, I continue to believe that West Hayden cannot be held liable for the actions of non-Board Member homeowners. First, HUD's interpretation of the statute strikes me as incredibly broad. Second, West Hayden lacks the resources to effectively police the interactions of each homeowner in the development. Third, even if it had the resources to police those interactions, West Hayden lacks the "arsenal of incentives and sanctions" to prevent discrimination held by the landowners in *Wetzel* and *Francis*, making those cases inapt. Finally, as a matter of public policy, I am reluctant to impose a duty under an extraordinarily broad reading of the Fair Housing Act requiring homeowners associations to police and correct disputes among neighbors; such a duty would almost certainly create more conflict than it prevented. If Congress wishes to impose this duty on homeowners associations, it must say so plainly.

by Mr. Bird and barred Plaintiffs' counsel from introducing Mr. Morris' surreptitious recording of that incident. Additionally, the following instruction was provided to the jury prior to their deliberations:

> The Homeowners Association is only liable for actions taken by (1) members of the Board, (2) agents of the HOA, and (3) employees of the HOA. The Homeowners Association is not liable for actions of residents who do not fall in to one of the three listed categories above. You are reminded that I have instructed you to disregard the portions of the testimony of Tatyana Burda, Katie Dotts, Jessica Hotvedt, Annabelle Sky Farley, Blaine Svetich, David Silva, Russell Deming, and Kristy Morris that described their interactions with an individual shouting at them on the street, because it was not established that such individual was a member of the Board or an agent or employee of the HOA. I also instructed you to disregard the portion of Exhibit 3034 which discussed the threats made against Mr. and Mrs. Morris by Mr. Bird, for the same reason. That evidence has been stricken, and you are not to consider it in reaching your verdict.

Although the Court ordinarily presumes that jurors will follow the Court's instructions with respect to stricken evidence, *S. Pac. Co. v. Smith*, 83 F.2d 451, 452 (9th Cir. 1936), the presumption is not absolute. In this case, it is exceedingly unlikely that the jury was actually able to set aside the testimony of nine witnesses regarding threats they received from third parties. Moreover, Ms. Morris' testimony regarding Mr. Bird's "death threat" and the impact it had on her undoubtedly remained in the mind of the jury, despite the Court's instruction.

The unfair prejudice suffered by the Homeowners Association was compounded by the fact that Plaintiffs' characterization of Mr. Bird's statements as a "death threat" is an embellishment. The Court reviewed Plaintiffs' proposed exhibit 1005, which is a recording of a conversation between Mr. Morris and Mr. Bird, in which Mr. Bird

allegedly threatened to kill Mr. Morris. Mr. Bird's statements, as recorded, cannot be reasonably interpreted as a credible "death threat."

Thus, the jury, despite the Court's instructions, undoubtedly considered the threats made to the Plaintiffs and the Christmas program attendees in arriving at their verdict. Worse yet, the "death threat" that Plaintiffs referred to frequently early on in the trial was hyperbole. As a result of the unique circumstances in this case, Plaintiffs benefited (1) by improperly getting evidence regarding threats before the jury and (2) having that evidence excluded before the Homeowners Association could expose the hyperbole. This result is unjust.

**3. Plaintiffs Failed to Offer Sufficient Proof in Support of Their Fair Housing Act Claims**

**A.    *42 U.S.C. § 3604(b) Claim***

Section 3604(b) of the Fair Housing Act makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale … of a dwelling, or in the provision of services or facilities in connection therewith, because of" that person's religion. To prove that the Homeowners Association violated section 3604(b), Plaintiffs were required to prove each of the following by a preponderance of the evidence:

1.    They were qualified to purchase a home in the West Hayden Estates;

2.    The Homeowners Association intentionally discriminated against Plaintiffs' during the process of purchasing their home or after its purchase; and

3.    The discrimination was, at least in part, due to Plaintiffs' religious beliefs or practices.

First, Plaintiffs failed during the trial to offer proof upon which a reasonable jury could conclude that the Homeowners Association *intentionally* discriminated against Plaintiffs. To reiterate, the January 2015 Letter, and the circumstances under which it was drafted and sent, do not support the conclusion that the Homeowners Association intended to discriminate against Plaintiffs. To the contrary, in an effort to be responsive to Plaintiffs' demand for a quick answer, the Homeowners Association hurriedly drafted the January 2015 Letter and sent it out prior to securing full approval by the Board.

Turning to the third element of a Section 3604(b) claim, in their haste to respond to Plaintiffs, the Homeowners Association included language indicating a need to respect religious pluralism in West Hayden Estates. While January 2015 Letter was not drafted with lawyerly precision and contained a boorish reference to "undesireables," it cannot be read as evidence that the Homeowners Association intended to discriminate against Plaintiffs because they were Christian. On this score, the Court notes that several members of the Board were practicing Christians. Furthermore, Board President Jennifer Scott is both a practicing Christian and married to a Christian minister. The Court is not suggesting that Christians cannot, *per se*, discriminate against other Christians. But, the fact that the Board was at least partially composed of practicing Christians significantly decreases the probability that the Board intended to discriminate against Plaintiffs based on a faith shared by both Plaintiffs and several Board members.

### B.     *42 U.S.C. § 3604(c) Claim*

Section 3604(c) of the Fair Housing Act makes it unlawful "[t]o make … any statement … with respect to the sale … of a dwelling that indicates any preference, limitation, or discrimination based on … religion … or an intention to make any such preference, limitation, or discrimination."   Plaintiffs were required to show by a preponderance of the evidence that:

> 1.    The January 2015 Letter constituted a statement with respect to the sale of a dwelling; and

> 2.    An ordinary reader would interpret the statement as expressing a preference that a non-religious individual purchase Plaintiffs' home.

Finders of fact evaluating a claim under section 3604(c) may use the context in which the statement was made to evaluate whether the statement expresses a preference that a non-religious individual purchase the home.

Plaintiffs failed to offer sufficient evidence upon which a reasonable jury could conclude that an ordinary reader would interpret the January 2015 Letter as expressing a preference that a non-religious individual purchase Plaintiffs' home.  Again, the January 2015 Letter attempts to express concerns rooted in religious pluralism.  Although it does use the word "undesirables" in apparent reference to individuals who would be attending Plaintiffs' Christmas celebration, the clearest statement of the Homeowners Association's intent in the January 2015 Letter is the following language: "It is not the intention of the Board to discourage you from becoming part of our great neighborhood."  Exhibit 3005.

### C.    42 U.S.C. § 3617 Claim

Section 3617 of the Fair Housing Act makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed … any right granted or protected by section … 3604." Plaintiffs were required to prove by a preponderance of the evidence that:

1. They were engaged in the protected activity of purchasing and enjoying their home free from religious discrimination;

2. The Homeowners Association threatened, intimidated, or interfered with their enjoyment of those rights; and

3. The Homeowners Association's actions were taken because of Plaintiffs' religious practices.

Because the Court finds that Plaintiffs failed to put forth sufficient evidence upon which a reasonable jury could conclude that the Homeowners Association violated section 3604(b) of the Fair Housing Act, it must find that Plaintiffs failed to put forth sufficient evidence regarding section 3617 as well.  Rather than rehashing prior analysis within the context of section 3617, the Court will simply note two other facts of consequence.  First, despite the Homeowners Association's alleged interference, Plaintiffs nevertheless purchased the home in question.  Second, although Plaintiffs were on notice that the Homeowners Association believed that the Christmas program violated the CC&Rs, Plaintiffs nevertheless hosted the Christmas Program in both 2015 and 2016. Thus, it is hard to see how the Homeowners Association "interfer[ed]" with Plaintiffs exercise of their rights in any meaningful way.

D.    *Conclusion*

The Court, having reviewed all of the evidence in the light most favorable to the Plaintiffs, concludes that Plaintiffs have failed to offer sufficient proof upon which a reasonable jury could conclude that the Homeowners Association violated sections 3604(b), 3604(c) and 3617 of the Fair Housing Act. As it must in the Rule 50 context, the Court has not evaluated the credibility of the witnesses in deciding the issue. Put simply, the January 2015 Letter, which is by far Plaintiffs strongest piece of evidence, does not support the conclusion that the Homeowners Association intended to discriminate against Plaintiffs due to Plaintiffs' Christian faith. As such, judgment as a matter of law in favor of the Homeowners Association is appropriate.

### 4. In the Alternative, Plaintiffs Are Entitled to a New Trial

Given the Court's finding that judgment as a matter of law in favor of the Homeowners Association is appropriate, it is not *necessary* for the Court to evaluate whether a new trial and remittitur are appropriate. But, given the Court's near certainty that its decision will be appealed to the Ninth Circuit and the command of Federal Rule of Civil Procedure 1 to secure the "just, speedy, and inexpensive determination of every action," the Court will include its analysis on the questions of whether a new trial and remittitur are appropriate so that the Ninth Circuit can avoid reviewing this case piecemeal.

In light of the Court's analysis regarding the Homeowners Association's Rule 50(b) motion, at a minimum the Homeowners Association is entitled to a new trial. Under the Rule 50(b) standard, the Court may not "weigh the evidence or make

credibility determinations." *Go Daddy Software, Inc.*, 581 F.3d at 961 (quoting *Reeves*, 530 U.S. at 150) (internal quotations omitted). Conversely, under Rule 59 the trial court may assess the credibility of the witnesses. *See Kode*, 596 F.3d at 612.

In this case, the key witnesses were Mr. Morris and Ms. Scott. Mr. Morris was not credible. The recordings Mr. Morris created of his interactions with other homeowners in the West Hayden Estates show that he was aggressively confrontational with those homeowners and routinely threatened them with litigation. Ms. Scott testified that Mr. Morris "told … [me] a story about how he sued his sister and I think that it just intimidated me that he would sue us if he didn't get his way." Furthermore, Mr. Morris' testimony was riddled with inconsistencies. For example, Mr. Morris testified that he only left the 200,000 lights that covered his house on past 8:00 PM one year on Christmas eve and Christmas. However, a Facebook post authored by Mr. Morris explicitly states on December 23, 2016 that the lights would be left on between 5:00 PM to 10:00 PM from December 23rd through Christmas day. Exhibit 3014. Although this inconsistency seems minor, Mr. Morris' testimony was frequently contradicted by extrinsic evidence that he himself created.

Conversely, Board President Jennifer Scott was convincing and credible throughout her testimony. Ms. Scott described the rushed process that resulted in the January 2015 Letter and her interactions with Mr. Morris. In particular, she noted that after he received the January 2015 Letter, Mr. Morris called her ten times over a month-long period. The conversations lasted anywhere between forty-five minutes to an hour

and a half. During those calls, Mr. Morris was aggressively confrontational with Ms. Scott, who eventually asked him to stop calling her. Eventually, Ms. Scott's interactions with Mr. Morris drove her to resign her presidency.

Of course, Mr. Morris and Ms. Scott were not the only witnesses to testify. But, the Court's evaluation of their respective testimony is representative of its evaluation of the witnesses in the case more broadly. Almost uniformly, Plaintiffs' witnesses did not present credible testimony that held up under cross-examination. To the contrary, the Homeowners Association's witnesses presented credible testimony that conformed with the extrinsic evidence in the case. Given the foregoing, Court concludes that, in the alternative to granting the Homeowners Association judgment as a matter of law, the Homeowners Association is entitled to a new trial.

### 5. Further in the Alternative, the Court Orders Remittitur

Next, the Court turns to the issue of remittitur. The jury in this case awarded $60,000 in compensatory damages and $15,000 in punitive damages. Dkt. 103. Remittitur is appropriate where when the damages awarded by the jury are "grossly excessive or monstrous, clearly not supported by the evidence, or only based on speculation or guesswork." *Los Angeles Memorial Coliseum Comm'n*, 791 F.2d at 1360.

The sole evidence related to damages in this case came in the form of testimony from Mr. Morris. In his testimony, Mr. Morris stated that he wanted (1) compensation sufficient to cover moving expenses for a *future* move from West Hayden to a different residence; (2) de-annexation of his current home from the Homeowners Association; and

(3) additional damages to account for aggravation to his pre-existing medical condition. *Id.*

Applying the standard set forth by the Ninth Circuit in *Los Angeles Memorial Coliseum Comm'n*, the Court finds that the damages awarded by the jury were not supported by the evidence and were based on speculation. Beginning with the compensatory damages, Mr. Morris' testimony is the sole source of support for the conclusion that $60,000 was required for closing costs, moving expenses, and cleaning of his current residence. No other evidence was offered. Even Mr. Morris, however, testified with respect to the $60,000 figure that he had the number "written … down earlier" but was not "positive of that number." This uncertainty was compounded by the fact that Mr. Morris was seeking damages associated with a *future* move. The combination of Mr. Morris' uncertainty, and the fact that Mr. Morris was the sole source of evidence supporting a *projected* damages amount, leads the Court to conclude that the jury's award of damages was both speculative and not supported by the evidence.

The $15,000 punitive damages award is also problematic for two reasons. First, the evidence in this case uniformly supports the Homeowners Association's version of events. Plaintiffs failed to present any evidence suggesting that the Homeowners Association acted with an evil motive or was reckless or callous with respect to Plaintiffs' rights. To the extent that Plaintiffs' punitive damages claim was based on aggravation to Mr. Morris' pre-existing condition, Plaintiffs presented no evidence on what that condition is or the extent to which it was aggravated.

Second, it is likely that the jury, despite the Court's instruction to the contrary, awarded Plaintiffs legal fees under the guise of punitive damages. During their deliberations, the jury submitted the following question to the Court, "Instead of a dollar amount, [*sic*] for punitive damages, can we list legal fees." Dkt. 102 at 4. The Court responded that the jury's consideration of punitive damages was to be guided by Court's Instruction Number 17 on punitive damages. Dkt. 102 at 5. Within minutes of the bailiff relaying the Court's answer to the jury, the foreperson contacted the bailiff to announce that the jury had reached a verdict. Given that the jury had little if any time to evaluate the evidence after it received the Court's answer, the Court is persuaded that the jury was attempting to award Plaintiffs their attorney's fees under the guise of punitive damages.

In the event that the Homeowners Association is not entitled to judgment as a matter of law or a new trial, the Court orders remittitur. Plaintiffs' compensatory award is reduced to the amount of $1 for each of Plaintiffs' claims. Plaintiffs' award of punitive damages is also reduced to $1. Alternatively, Plaintiffs may elect to proceed to a new trial.

**6. The Homeowners Association's Counterclaim**

Finally, the Court turns to the counterclaim filed by the Homeowners Association. Dkt. 19 at 11-19. In their Answer, the Homeowners Association asks for injunctive relief (Dkt. 19 at 12) and attorney's fees related to the enforcement of the Declaration Establishing Covenants, Conditions, Restrictions and Easement for West Hayden Estates First Addition (hereinafter, "Declaration"), (Dkt. 19 at 18). The Parties did not object to

the Court trying the issue, rather than submitting it to a jury. After the jury portion of the trial concluded, Plaintiffs represented that they no longer intended to hold their Christmas program in light of the jury's verdict. Dkt. 113 at ¶ 2. But, because the Court is granting the Homeowners Association judgment as a matter of law and Plaintiffs are not entitled to de-annexation, a live controversy still exists as to whether Plaintiffs may host the Christmas program at their current residence going forward. Furthermore, a live controversy also exists with respect to whether the Homeowners Association is entitled to attorney's fees pursuant to the Declaration.

### A.    *Findings of Fact*

1.    The Homeowners Association is an Idaho non-profit corporation. Exhibit 3001.

2.    Lots within West Hayden Estates are subject to restrictive covenants detailed in the Declaration. Exhibit 3002.

3.    The Declaration was recorded in Kootenai County as Instrument Number 1618487. Exhibit 3002.

4.    The Declaration is enforced by the Homeowners Association's Board of Trustees. Exhibit 3002.

5.    Plaintiffs signed a purchase and sale agreement for their current residence on December 31, 2014. Exhibit 3009.

6.    The purchase and sale agreement provided Plaintiffs five days to review the Declaration. Exhibit 3009.

7.    After reviewing the Declaration, Plaintiffs signed an addendum to the purchase and sale agreement on January 20, 2015.  Exhibit 3009.

8.    The addendum states that Plaintiffs completed their "due diligence as it relates to the CC&Rs and HOA and … [are] satisfied."  Exhibit 3009 at 11.

9.    The Declaration contains the following provisions, which are reproduced in full:

a.  5.13 <u>Exterior Appearance</u>. In order to preserve a uniform exterior appearance of the buildings, the Board will provide each owner a list of design criteria to be used in the project. No owner may modify or decorate the exterior of any building, screens, doors, awnings or other portions of any lot visible from a neighboring lot without the prior written consent of the Board, and in accordance with Rules and Regulations of the Board. No exterior radio or television antennae may be installed without the prior written consent of the Board. No clotheslines shall be visible from the street or from neighboring lots. Windows shall be covered by drapes, shades or shutters and shall not be painted or covered with foil, cardboard or similar material.

b.  5.4.1 <u>Business Use and Certain Vehicles Prohibited</u>.  No dwelling unit shall be used for any purpose other than single-family residential purposes. Subject to the provisions of Section 5.2.24 below, no gainful occupation, profession, trade, craft, commercial or manufacturing, day care or other non-residential use shall be conducted on any Lot.  Recreation vehicle parking shall be allowed in a dedicated location on the property and not on the driveway, i.e. in garage, side yard behind fence or out building.

c.  5.4.2 <u>Nuisances</u>. No rubbish or debris of any kind shall be placed or permitted to accumulate anywhere upon the Property, and no odor shall be permitted to arise therefrom so as to render the Property or any portion thereof unsanitary, unsightly, offensive or detrimental to the Property or to its occupants, or to any other property in the vicinity thereof or to is occupants.  No noise or other nuisance shall be permitted to exist or operate upon any portion of the Property so as to be offensive or detrimental to the Property or to its occupants or to other property in the vicinity or to its occupants.  This includes a prohibition against any activity which would in any way interfere with the quiet enjoyment of any Owner, or increase [*sic*] any insurance policy to be canceled or non-renewed, or impair the structural integrity of any properly placed structure. Without limiting the generality of any of the foregoing provisions, no exterior speakers, horns, whistles, bells or other sound devices (other than security

devices used exclusively for security purposes which have been approved by the Committee), flashing lights or search lights, shall be located, used or placed on the Property without the prior written approval of the Committee.

d.  5.4.3 <u>Signs</u>.  No sign of any kind shall be displayed to the public view without prior written committee approval, except: (1) such signs as may be used by Declarant in connection with the construction, development, management or administration of the Property and sale of Lots; ( 2) temporary construction signs as permitted in the Design Guidelines; (3) such informational signs, of customary and reasonable dimensions, not to exceed five (5) square feet, as prescribed by the Committee, including "For Rent" or "For Sale" signs; and (4) such signs as may be required by legal proceedings or as required under Idaho state law.

e.  5.4.7 <u>Exterior Maintenance; Owner's Obligations</u>.  No Improvement shall be permitted to fall into disrepair, and each Improvement shall at all times be kept in good condition and repair.  In the event that any Owner shall permit any Improvement, including tress and landscaping, which is the responsibility of such Owner to maintain, to fall into disrepair so as to create a dangerous, unsafe, unsightly or unattractive condition, or damages adjoining property or facilities, the Committee, upon fifteen (15) days prior written notice to the Owner of such property, shall have the right to correct such condition, and to enter upon such owner's Lot for the purpose of doing so, and such Owner shall promptly reimburse the Committee for the cost thereof. Such cost shall be an Assessment and shall create a lien enforceable in the same manner as other Assessments set forth in Article VI of this Declaration. The Owner of the offending property shall be personally liable, and such Owner's property may be subject to a mechanic's lien for all costs and expenses incurred by the Committee in taking such corrective acts; plus all costs incurred in collecting the amounts due. Each Owner shall pay all amounts due for such work within ten (10) days after receipt of written demand therefor. In the alternative, or in the event the Committee does not arrange for the payment of such costs to be advanced, the Committee may take necessary actions to collect all costs for making such necessary repairs or corrections from the Lot Owner before causing such work to be performed.

f.  5.4.9 <u>No Hazardous Activities</u>.  No activities shall be conducted on the Property, and no Improvements constructed on any property which are or might be unsafe or hazardous to any person or property.

g.  5.4.15 <u>Lighting</u>. Exterior lighting, including flood lighting, shall be part of the architectural concept of the Improvements on a Lot. Fixtures, standards and all

exposed accessories shall be harmonious with building design, and shall be as approved by the Architectural Committee prior to installation. Lighting shall be restrained in design, and excessive brightness shall be avoided.

h.  5.5.2 <u>Animals</u>.  No reptiles, livestock, poultry, or birds of any kind shall be raised, bred or kept on any lot, or any portion of this property: except that no more than two (2) usual and ordinary household pets such as dogs, cats, or birds may be kept, provided that they are not kept, bred, or maintained for commercial purposes, and that they are caged or leashed and attended when not on the lot or property where they belong. Pet owners shall immediately retrieve any pet excrement deposited on any public property and place the same in a proper receptacle.

i.  8.1 <u>Right to Enforce</u>. The Committee, acting in the names of the individual Committee Members, acting on behalf of all Owners (except the Owner being subjected to enforcement actions), has the right to collect and enforce its Assessments pursuant to the provisions hereof. Each owner of a Lot, upon becoming an Owner of such Lot, shall be deemed to covenant and agree to pay each and every Assessment provided for in this Declaration and agrees to the enforcement of all Assessments in the manner herein specified. In the event an attorney or attorneys are employed for the collection of any Assessment, whether by suit or otherwise, or to enforce compliance with or specific performance of the terms and conditions of this Declaration, each Owner agrees to pay reasonable attorney's fees in addition to any other relief or remedy obtained against such owner. The Committee or its authorized representative may enforce the obligations of the Owners to pay such assessments by commencement and maintenance of a suit or pursuit of foreclosure, or by other means provided in this Declaration to enforce the liens created hereby. A suit to recover a money judgment for an unpaid Assessment shall be maintainable without foreclosing or waiving the lien hereinafter provided.

j.  11.5.2 <u>Violations and Nuisances</u>. The failure of any Owner of a Lot to comply with any provision hereof, or with any provision of the Design Guidelines, is hereby declared a nuisance and will give rise to a cause of action in the Declarant or any Owner of a Lot(s) within the Property for recovery of damages or for negative or affirmative injunctive relief or both.  However, any other provision to the contrary notwithstanding, only Declarant of the Committee, or a duly authorized agent of any of them, may enforce by self-help any of the provisions hereof only if such self-help is preceded by reasonable notice to the Owner.

10. General Findings Regarding Plaintiffs' Christmas Program

   a. Plaintiffs stated purpose for hosting the Christmas program was to support various charities and to engage in ministry.

   b. Plaintiffs did not seek, and were never given, Board approval to host their Christmas program.

11. 2015 Program

   a. Plaintiffs hosted their Christmas program in the West Hayden Estates in December of 2015.

   b. Mr. Morris estimated that he decorated the home with 200,000 lights. Exhibit 3019; Exhibit 3020; Exhibit 3021; Exhibit 3044.

   c. Plaintiffs, via Facebook, invited roughly 7,300 people to attend the Christmas program. Exhibit 3010.

   d. Plaintiffs also advertised the Christmas program with a large sign placed on their front lawn. Exhibit 3010; Exhibit 3020.

   e. The Christmas program lasted five nights. Exhibit 3018.

   f. Four commercial busses were used to transport people to and from the Christmas program. Exhibit 3018.

   g. The busses parked end to end in front of Plaintiffs' home and adjacent properties. Exhibit 3025.

h. Despite Plaintiffs' instructions not to drive to the event (Exhibit 3018), many Christmas Program attendees nevertheless drove to the event and parked throughout the neighborhood.

i. At a minimum, hundreds of people on a nightly basis attended the program; with thousands of people attending over the course of the five-day event. Exhibit 3012; Exhibit 3015; Exhibit 3016; Exhibit 3021.

j. People in costumes resembling the Grinch, Frosty the Snowman, Clifford the Big Red Dog, Roman Centurions, and Santa Claus made appearances throughout the course of the Christmas program. Exhibit 3026.

k. Additionally, a camel was brought in to help recreate the Nativity Scene. Exhibit 3013.

12. 2016 Program

a. Plaintiffs hosted the Christmas program again in 2016.

b. Plaintiffs used five busses to transport guests to and from the Christmas program.

c. The busses parked end to end in the area around Plaintiffs' house. At times, at least three busses were parked in front of Plaintiffs' home. Exhibit 1004.

d. The combination of busses, traffic from non-residents coming to view the Christmas program, and people walking to and from the program created congestion on the road in front of Plaintiffs' home. Exhibit 3059.

e.  West Hayden Estates also had traffic and parking issues similar to those it experienced during 2015 due to Christmas program attendees parking throughout West Hayden Estates.

f.  At the event, Plaintiffs again had camel and a donkey present as part of a Nativity Scene recreation.

g.   Additionally, a musician attended the event and used speakers to amplify the Christmas music that he was playing on his guitar.  Exhibit 3026.

h.  Speakers were also used to amplify recorded music such as the Christmas song Rudolph the Red Nosed Reindeer.  Exhibit 3027.

**B.**      *Conclusions of Law*

1.  Plaintiffs' lot, pursuant to the Declaration, is subject to the covenants, conditions, and restrictions contained therein.

2.  Plaintiffs' Christmas program violated Section 5.1.3 of the Declaration.  Section 5.1.3 prohibits "decorat[ing] the exterior of any building … visible from a neighboring lot without the prior written consent of the Board, and in accordance with the Rules and Regulations of the Board."  Plaintiffs' Christmas Program involved decorating the exterior of their home with 200,000 lights, a Nativity Scene, and characters in costume.  Each of these decorations was visible from neighboring lots.  Plaintiffs did not obtain Board approval for these decorations.  Accordingly, the Homeowners Association has shown by a preponderance of the

evidence that Plaintiffs' Christmas decorations violated Section 5.1.3 of the Declaration.

a. There was little evidence about how other homes on neighboring lots were decorated during holidays. To the extent that other homes were decorated with lesser Christmas lights or decorations, and the Homeowners Association has not attempted to prohibit such displays as a violation of Section 5.1.3, that requirement would have been waived. However, permitting more modest presentations of Christmas lights and decorations would not constitute a waiver of the right to enforce that provision against the Christmas displays at issue here, which were different in kind, rather than degree, from the typical displays made in homes throughout the United States during the month of December.

3. Plaintiffs' Christmas program violated Section 5.4.1 of the Declaration. Section 5.4.1 bars the use of a dwelling "for any purpose other than a single-family residential purpose." Here, Plaintiffs stated purpose for hosting the Christmas program was to raise money for charities and engage in ministry. Furthermore, Plaintiffs decorated their home in 2015 and 2016 with hundreds of thousands of lights and attracted thousands of people to attend and take part in the Christmas program. The Homeowners Association has shown by a preponderance of the evidence that Plaintiffs in 2015 and 2016 used their home for purposes other than "single-family residential" use.

4.      Plaintiffs' Christmas program violated Section 5.4.2 of the Declaration.  Section

5.4.2 "prohibit[s] … any activity which would in any way interfere with the quiet

enjoyment of any [other] Owner."  Plaintiffs' Christmas program interfered with

the ability of other homeowners in the West Hayden Estates to quietly enjoy their

own homes in a number of ways: (1) Plaintiffs used speakers outside of the home

to amplify sound, (2) the busses employed by Plaintiffs blocked traffic and created

noise, (3) the cars parked by non-residents throughout West Hayden blocked

traffic, (4) the thousands of people who attended the Christmas program created

excessive congestion in the neighborhood and temporarily changed, indeed

destroyed, the quiet, suburban nature and appearance of the subdivision.

Accordingly, the Homeowners Association has shown by a preponderance of the

evidence that Plaintiffs' Christmas program interfered with other homeowners'

quiet enjoyment of their homes.

5.      Plaintiffs' Christmas program violated Section 5.4.3 of the Declaration.  Section

5.4.3 prohibits "sign[s] of any kind shall … [from being] displayed to the public

… without prior written committee approval."  Section 5.4.3 contains exceptions

for certain signs that are not applicable in this case.  Part of the advertising for

Plaintiffs' Christmas program included the placement of a large sign on Plaintiffs'

front lawn.  Accordingly, the Homeowners Association has shown by a

preponderance of the evidence that Plaintiffs' signage violated Section 5.4.3 of the

Declaration.

6. Plaintiffs' Christmas program violated Section 5.4.9 of the Declaration. Section 5.4.9 prohibits "activities … conducted on the Property … which are or *might be unsafe* or hazardous to any person or property." Plaintiffs' Christmas program generated significant traffic and parking issues throughout West Hayden Estates. Given the congestion, emergency personnel responding to an incident in West Hayden Estates would have difficulty accessing certain houses close to Plaintiffs' home. Accordingly, the Homeowners Association has shown by a preponderance of the evidence that Plaintiffs' Christmas program violated Section 5.4.9 of the Declaration.

7. Plaintiffs' Christmas program violated Section 5.4.15 of the Declaration. Section 5.4.15 requires exterior lighting to be "restrained in design, and excessive brightness shall be avoided." Plaintiffs used over 200,000 lights during their Christmas program. Plaintiffs' design was unrestrained and excessive. Accordingly, the Homeowners Association has shown by a preponderance of the evidence that Plaintiffs' Christmas program violated Section 5.4.15 of the Declaration.

8. Plaintiffs' Christmas program violated Section 5.5.2 of the Declaration. Section 5.5.2 states "No reptiles, livestock, poultry, or birds of any kind shall be raised, bred or kept on any lot, or any portion of this property." Plaintiffs kept both a camel and donkey on their property as part of their recreation of the Nativity Scene. Both animals fall within the category of livestock. Accordingly, the

Homeowners Association has shown by a preponderance of the evidence that Plaintiffs' Christmas program violated Section 5.5.2 of the Declaration.

9.     Plaintiffs' Christmas program violated Section 11.5.2 of the Declaration. Section 11.5.2 states "failure of any Owner of a Lot to comply with any provision … [of the Declaration] is … a nuisance." Plaintiffs' Christmas program violated Sections 5.1.3, 5.4.1, 5.4.2, 5.4.3, 5.4.9, 5.4.15, and 5.5.2. Accordingly, the Homeowners Association has shown by a preponderance of the evidence that Plaintiffs' Christmas program was a nuisance that violated Section 11.5.2 of the Declaration.

### 6. Conclusion

Despite the foregoing, I hasten to add one final thought. The jury in this case cannot and should not be criticized. Throughout the trial they were engaged and submitted questions indicating that they were each, in good faith, attempting to discharge their duty as the finders of fact. Nevertheless, they issued a legally unsupportable verdict. In thirty-one years as a trial judge on both the state and federal bench, I have, on rare occasion, disagreed with conclusions reached by juries. Almost invariably in those instances, however, I deferred to the wisdom of our Founders and trusted that the jury's collective mind was able to more accurately assess the facts than my own.

This case is simply different. Plaintiffs have failed to set forth facts that are a legally sufficient basis upon which a reasonable jury could conclude that the Homeowners Association violated sections 3604(b), 3604(c), and 3617 of the Fair

Housing Act.  Thus, the Homeowners Association is entitled to judgment as a matter of law pursuant to Rule 50(b).  Viewed through the lens of a Rule 59 motion for a new trial, the jury's assessment of the witnesses put forth by Plaintiffs and the Homeowners Association was plainly erroneous, as was the jury's decision to award Plaintiffs more than nominal damages.  Finally, the Court finds that Plaintiffs violated the terms of the Declaration, thereby entitling the Homeowners Association to an injunction and attorney's fees.

## ORDER

**IT IS ORDERED:**

1. The Homeowners Association's Motion for Judgement as a Matter of Law Pursuant to Rule 50(b) is **GRANTED**.

2. In the alternative, the Homeowner's Association is **GRANTED** a new trial pursuant to Rule 59.

3. Further in the alternative, the Court **ORDERS** remittitur.  Plaintiffs will accept compensatory and punitive damages in the combined amount of $4.00.  Plaintiffs may alternatively elect to proceed to a new trial.

4. The Homeowners Association's Motion to Strike Affidavits of Jeremy Morris, Lorilee Anne Addy, and Russell Deming (Dkt. 115) is **DENIED**.

5. Plaintiffs' Motion for Injunctive Relief in the Form of De-Annexation from the West Hayden Estates Homeowners Association (Dkt. 107) is **DENIED**.

6. Plaintiffs are **PERMANENTLY ENJOINED** from hosting a Christmas program in the West Hayden Estates that violates the CC&Rs in the manner described in this decision.

7. Pursuant to Declaration Section 8.1, Plaintiffs are **ORDERED** to pay the Homeowners Association's attorney's fees stemming solely from the prosecution of the Homeowner Association's counterclaim. The Homeowner Association's counsel shall submit a petition for fees and costs within ten (10) days from the date of this decision. Plaintiffs' shall have five (5) days thereafter to file any objections to the reasonableness of the costs and fees sought, and the Homeowners Association's counsel shall have five (5) additional days to file a reply to any such objections. The Court will then issue an order setting the amount of fees and costs awarded.

DATED: April 4, 2019

B. Lynn Winmill
U.S. District Court Judge